IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| ECEM EUROPEAN CHEMICAL | : | |
| MARKETING B.V., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  05-3078 |
| | : | |
| v. | : | |
| | : | |
| THE PUROLITE COMPANY, | : | |
| | : | |
| | : | |
| Defendant. | : | |


## OPINION

Slomsky, J.                                                                                    January 29, 2010

Before the Court are two Motions *in limine* filed by Plaintiff ECEM European Chemical
Marketing B.V. ("ECEM") and three Motions *in limine* filed by Defendant The Purolite Company
("Purolite").  Plaintiff seeks in the Motions *in limine* to (1) preclude evidence of Defendant's alleged
damage estimates (Doc. No. 65) and (2) preclude evidence that Plaintiff was obligated to supply
Defendant with styrene, a chemical product, through March 2005 (Doc. No. 64).  Defendant filed
Responses to these Motions (Doc. Nos. 66 and 67), and Plaintiff submitted a supplemental brief in
support of its Motion *in limine* to preclude evidence that Plaintiff was obligated to supply styrene
through March 2005 (Doc. No. 78).  Defendant also filed a supplemental brief in opposition to
Plaintiff's two Motions *in limine* (Doc. No. 80).

In Defendant's three Motions *in limine*, Defendant seeks to (1) exclude evidence of
settlement negotiations (Doc. No. 59); (2) bar the use of a document entitled: "Terms and Conditions

of Sale" (Doc. No. 60); and (3) to exclude evidence of prior negotiations leading up to the 2004 contract between the parties, and evidence that the 2004 contract was not accepted and binding (Doc No. 61). Plaintiff filed Responses to these Motions (Doc. Nos. 70, 72, and 69). Thereafter, Defendant filed a Reply Brief on Parol Evidence Issues (Doc. No. 73) covered in the Motion to exclude the "Terms and Conditions of Sale" document and the Motion to exclude prior negotiations. Plaintiff also filed a supplemental brief in opposition to the Motion *in limine* to exclude evidence of settlement negotiations (Doc. No. 82) and a supplemental brief in opposition to the Motions *in limine* to exclude evidence of prior negotiations leading up to the 2004 contract and to exclude evidence of the "Terms and Conditions of Sale" document (Doc. No. 81). Finally, Defendant filed a supplemental brief in support of its three Motions *in limine* (Doc. No. 80).

The Court held oral argument on the five Motions *in limine* on October 20, 2009. For the reasons that follow, Plaintiff's Motions *in limine* will be granted in part and denied in part, and Defendant's Motions *in limine* also will be granted in part and denied in part.

## I.    STATEMENT OF FACTS

Defendant Purolite is an international company with its principal place of business in the United States. Defendant manufactures ion exchange resins and polymers which are used to remove impurities from water and other liquid and gas media. Styrene Monomer is an essential ingredient used in the manufacture of resins and polymers. Plaintiff ECEM, with its principal place of business in the Netherlands, is a buyer and seller of industrial products such as styrene. Plaintiff purchases styrene directly from a manufacturer and then sells it to an end user such as Defendant.

Plaintiff and Defendant engaged in a series of agreements beginning in 2002 through which Plaintiff supplied Defendant with styrene for use in Defendant's production of resins and polymers.

During the relevant time period, Plaintiff supplied the styrene by delivery in rail tank cars ("RTC") from Plaintiff's supplier in Rotterdam, the Netherlands, to Defendant's plant in Victoria, Romania.

In December 2003, the parties began negotiations on an agreement for the year 2004. On December 16, 2003, Defendant submitted its Purchase Order for 2004, which was accepted by Plaintiff ("2004 Contract"). The 2004 Contract provided for a yearly delivery of 1200 tons of styrene, with deliveries of approximately 100 tons per month via two RTCs, for arrival at Defendant's plant in Victoria, Romania, during the third week of the month. In March 2004, the parties modified the 2004 Contract to require Plaintiff to deliver three (3) shipments of styrene per month via RTC. The parties agreed that Plaintiff would keep the third railcar in service for one year until March 2005, but the parties dispute whether the contract modification extended the entire contract by three (3) months to March 2005. Via email, the parties agreed that if Plaintiff committed to leasing a third rail tank car in March 2004 for twelve (12) months, Defendant would commit to purchase styrene from Plaintiff using at least one rail tank car for that same period.

This case arises from Defendant's failure to pay for five shipments of styrene received in the last quarter of 2004 for which payment was apparently due in late 2004 or the first quarter of 2005. Plaintiff filed this action in June 2005 seeking payment of principal, interest, and fees and costs stemming from the five unpaid deliveries (Invoice Numbers 44247,44656, 44817, 44818, and 45046). The 2004 Contract provided that the delivery terms were "DDU Victoria," which stands for "Delivery Duty Unpaid," Victoria, Romania. Under the DDU agreement, Plaintiff was required to bear the costs and risks involved in bringing the goods to Victoria, Romania from Rotterdam, the Netherlands. The 2004 Contract required under the provision for "Payment Terms" that payments were due ninety (90) days from the date of invoice. Pursuant to the agreement, two (2) invoices were

to be issued by Plaintiff, (1) a *pro forma* invoice, which is generated for customs purposes when the material is set to be shipped, and (2) a commercial invoice, which is provided to the customer after delivery is made to the place of destination. Plaintiff maintains that Defendant consistently failed to pay invoices within ninety (90) days of issuance in late 2004. Due to Defendant's tardiness in remitting payment, Plaintiff did not accept Defendant's purchase order in December 2004 for the 2005 calendar year and did not ship styrene to Defendant after December 2004.

Defendant maintains that based on the DDU term of the 2004 Contract, title to the styrene did not pass until the materials reached Defendant's plant in Victoria, Romania. The ninety (90) day period for payment could not start, therefore, until the goods reached Victoria. Plaintiff does not agree to this start date and argues that the ninety (90) day period began from the date of the initial *pro forma* invoice, rather than the date of delivery. Based on Plaintiff's claim, Defendant became delinquent on five unpaid deliveries in late 2004. As noted, Plaintiff ceased styrene deliveries to Defendant after December 2004, which Defendant submits was a breach of the 2004 Contract modification which obligated Plaintiff to continue deliveries until March 2005.

In ¶12 of Defendant's Answer, Defendant raised the affirmative defense that "[ECEM] has breached the agreement and is not entitled to the sum it demands, if any." Defendant maintains that it is not obligated to pay for the five (5) deliveries because Plaintiff failed to deliver two (2) RTCs of styrene in November 2004, as required by the March 2004 Contract modification. In November 2004, Plaintiff shipped three (3) rail tank cars of styrene to Defendant. One shipment was sent on November 9 and received in Victoria, Romania, on November 19 (RTC 288.6). Two additional rail tank cars of styrene (RTC 613.4 and RTC 616.7) were shipped on November 25 and were accidentally routed by the common carrier to another location. As a result, Defendant only received

4

one (1) rail tank car of styrene at the Victoria plant for November. The misdirected shipment allegedly caused Defendant's styrene supply to be depleted on December 14, 2004. Plaintiff asserts that it offered to compensate Defendant with road truck deliveries of styrene after the error in the rail tank car shipment became apparent, but Defendant rejected this offer.

The two rail tank cars containing styrene shipped on November 25 were finally received by Defendant on December 21, 2004. Defendant alleges that after these untimely deliveries, Plaintiff terminated the 2004 Contract with Defendant. According to Defendant, the parties subsequently entered into settlement negotiations in order to avoid litigation. These discussions were ultimately unsuccessful.

Defendant has filed a counterclaim in this matter, asserting that Plaintiff failed to deliver two rail tank cars of styrene until approximately one week after Defendant's styrene supply had been depleted. Defendant alleges that during this week, it could not produce polymers and resins it had planned to produce on two of its nine production lines and suffered damages. Plaintiff maintains that Defendant did not mention the alleged shut-down in production nor any alleged loss until Defendant filed the counterclaim on February 8, 2006.

## II.    DISCUSSION

A.    Plaintiff's Motion *in Limine* to Preclude Evidence
Of Defendant's Alleged Damage Estimates.

Plaintiff contends that the evidence and methodology of calculating Defendant's alleged damage claim should be precluded from evidence at trial. In December 2004, Defendant planned to produce polymers and resins with styrene delivered by Plaintiff. However, Plaintiff failed to timely deliver two rail tank cars of styrene. The styrene eventually arrived approximately one week

after Defendant's supply of styrene had been depleted, causing Defendant to cease polymer and resin production until the styrene arrived at Defendant's plant in Victoria, Romania.

Defendant submits that its factories run 24 hours a day, 7 days a week, and that as a direct result of the late delivery of styrene, it was forced to pay normal recurring costs for overhead which did not result in production of resins or polymers and suffered a loss. Defendant describes the methodology of its damage calculation as follows:

> Quite simply, Purolite prepares a "recipe" for each product that it plans to make in a given year, which identifies in detail the components of time and materials to produce that product. Overhead costs are determined in the aggregate for each line item of cost for the year. The capacity of Purolite's plant has a defined limit for each production line. Overhead costs are then allocated to products based on the time and materials needed to produce that product. The total of overheads per unit times the volume to be produced equals total overhead absorbed in production.
>
> Thus, Purolite calculates its damages by identifying each polymer and resin that was scheduled to have been produced, and the quantity of each polymer and resin that would have been produced, and identifying the overhead per metric ton for each polymer and resin to be produced.

(Defendant's Memo of Law in Opposition to Plaintiff's Motion *in Limine* to Exclude Evidence of Damages, 5.) Defendant asserts that this data is compiled utilizing the "standard cost" method of accounting in accordance with generally accepted accounting principles established by the Financial Accounting Standards Board. Using these principles, Defendant calculates that it incurred and lost $498,131 in overhead to maintain the plant during the week it was not able to produce the polymers and resins due to Plaintiff's untimely delivery of styrene. In opposing this method of calculating damages, Plaintiff argues that it fails to accurately measure costs incurred or profits lost, and that this calculation provides no reasonable certainty of the amount of damages sustained.

6

Under Pennsylvania law, evidence of damages may only be precluded from trial as "speculative" if "the uncertainty concerns the *fact* of damages not the *amount*." <u>Carroll by Burbank v. Phila. Hous. Auth.</u>, 650 A.2d 1097, 1100 (Pa. Cmmw. Ct. 1994) (emphasis added). "Damages are considered remote or speculative only if there is uncertainty concerning the identification of the existence of damages rather than the ability to precisely calculate the amount or value of damages." <u>Kituskie v. Corbman</u>, 714 A.2d 1027, 1030 (Pa. 1998). Moreover, "overhead should be treated as a part of gross profits and recoverable as damages." <u>Vitex Mfg. Corp. v. Caribtex Corp.</u>, 377 F.2d 795, 798 (3d Cir. 1967).

Plaintiff argues that Defendant's damage calculation is speculative because Defendant's method of calculating damages fails to accurately measure costs incurred or profits lost. Defendant has stated, however, that it will produce at trial witnesses with personal knowledge of Purolite's business, expenses and accounting to explain its theory of damages. Based upon the methodology offered by Defendant, there does not appear to be any uncertainty of the fact of damages. The validity of Defendant's damage calculation is a question of fact, and Plaintiff will be afforded the opportunity to cross-examine Defendant's witnesses on damages, to present its own witnesses, and to assert arguments concerning alleged infirmities in Defendant's damage calculation. Consequently, Plaintiff's Motion *in limine* (Doc. No. 65) will be denied.

B.    Plaintiff's Motion *in Limine* to Preclude Evidence and/or Testimony That Plaintiff Was Obligated to Supply Defendant With Styrene Through March 2005.

1.    Defendant Has Raised This Claim and/or Defense Timely.

Plaintiff argues that the first time Defendant claimed that the 2004 Contract between the parties was modified in March 2004 to extend the contract date by three (3) months was in the Response to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 39). Plaintiff contends that Defendant has never requested discovery regarding this claim or defense, nor has Plaintiff had the opportunity to seek discovery regarding this claim or defense. As such, Plaintiff argues that Defendant has waived this claim and seeks to preclude evidence on this alleged contract modification, which would have required Plaintiff to supply Defendant with styrene through March 2005.

Defendant maintains that the March 2004 contract modification and the alleged extension were discussed during the deposition of Matthew Rigby, Plaintiff's Managing Agent, which took place during discovery in August 2007. Defendant submits that Mr. Rigby's testimony confirmed that the March 2004 contract modification placed a third rail tank car in service, and that the third rail tank car would remain in service to supply monthly styrene deliveries to Defendant until March 2005. Mr. Rigby's deposition testimony provides, in part, as follows:

> Q.    Okay. And the modification was that ECEM would now provide a third railcar, which would provide three railcars per month, and in return Purolite would commit to an extra year from March of 2004; isn't that correct?
>
>         **[objection by counsel]**
>
> A.    I understand. It's an extra year on this one railcar. For the other two railcars, it was finished on 31st December, 2004.

Rigby Dep., 163:24-164:20. Moreover, Defendant points out that Mr. Rigby explained on March 12, 2004, in an email to Brian Wareham, Defendant's Materials Manager, the new contract provisions.

> I can now formally confirm we have made arrangements to put a third rail car into service for delivering styrene to you. Our guys will manage this along with the other two and it will mean we should be able to get up to three rail cars delivered every month (in other words up to 174 mt per month). We expect the new rail car to be in service the first week of April.
>
> As discussed we have to take a year contract on these rail-cars so certainly for this one at least the volume will keep coming through to the end of Q1 2005.
>
> Thank you for giving us the opportunity to extend our contract. I believe the rail-cars have worked very well so far this year and can only expect they will continue to do so.

Finally, Defendant contends that the Answer, filed February 8, 2006, specifically raised the affirmative defense that "Plaintiff breached the agreement and is not entitled to the sum it demands, if any." (Defendant's Answer, ¶12.) Although this defense is vague as to its specific claim, the Court still finds that Plaintiff was adequately on notice of the claim or defense in question based on a combination of Defendant's Answer, Mr. Rigby's deposition testimony and the email correspondence between Mr. Rigby and Mr. Wareham, and that it was timely asserted by Defendant.

### 2. Evidence Of the Contract Extension Is Relevant But Will Be Limited Under Federal Rule Of Evidence 403.

Next, Plaintiff argues that admission of evidence that Plaintiff was obligated to provide Styrene through March 2005 should be precluded pursuant to Federal Rule of Evidence 403. Before a court determines if evidence should be precluded on the basis of Rule 403, the evidence must be deemed relevant pursuant to Federal Rule of Evidence 401 and admissible under Rule 402. These

rules apply even when a court finds that a claim, and evidence in support of it, has been timely raised as occurred here.

Under Rule 401, "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Rule 402, all relevant evidence is admissible, barring an exception to the rules. "The definition of relevant evidence is very broad," and "Rule 401 does not raise a high standard." Gibson v. Mayor of Wilmington, 355 F.3d 215, 232 (3d Cir. 2004) (quotation omitted).

In this case, Plaintiff seeks recovery from Defendant based on the alleged breach of the 2004 Contract consisting of failure to make timely payments on five (5) shipments of styrene. Defendant asserts in the counterclaim and as an affirmative defense that Plaintiff's termination of the 2004 Contract and subsequent failure to deliver styrene through March 2005 constitute breaches for which Defendant may recover. That the contract was allegedly modified and extended in March 2004 is relevant to the claims of both parties.

Despite being relevant, however, evidence may be excluded under Rule 403. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit the evidence." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 (3d Cir. 2002). "In balancing, 'the proper equation places on one side the maximum reasonable probative force for the

offered evidence,' while 'the other side of the equation should include the likely prejudicial impact of the evidence.'" Id. at 1344 (citation omitted). As such, "evidence may be excluded if its probative value is not worth the problems that its admission may cause." Id. at 1343.

Relevant evidence should only be precluded under Rule 403 if it is *unfairly* prejudicial to a party, not merely because it is harmful to a party. As the Third Circuit has noted: "Evidence should be excluded under Rule 403 only sparingly since the evidence excluded is concededly probative. The balance under the rule should be struck in favor of admissibility." Blancha v. Raymark Indus., 972 F.2d 507, 516 (3d Cir. 1992) (citation omitted).

As noted at the hearing on the Motions *in limine*, evidence that Plaintiff breached the 2004 Contract because it failed to deliver styrene to Defendant through March 2005 will not be allowed at trial under the balancing test of Rule 403. Plaintiff's failure to actually supply styrene through March 2005 is not a central issue in this case. Instead, the crux of Defendant's claim involves the failure of Plaintiff to timely deliver two (2) RTCs of styrene in November 2004. The crux of Plaintiff's claim is the failure of Defendant to timely pay for shipments of styrene sent in the last quarter of 2004. The probative value of evidence that Plaintiff stopped making a rail shipment of styrene after December 2004 under the agreement extended to March 2005 is substantially outweighed by the fact that it will confuse the issues, unduly delay testimony on critical issues in the case, and cause undue prejudice.

However, proof that the contract was extended to March 2005, without any reference to Plaintiff breaching the 2004 Contract by failing to deliver styrene through March 2005, is admissible for two reasons. First, it supports Plaintiff's argument as to why Plaintiff used the third rail tank car.

Second, it supports Defendant's claim that it was not in breach of the 2004 Contract in January 2005 for failure to pay the invoices because Plaintiff's invoicing procedures were not in accord with the terms of the 2004 Contract. (See Trans. Oct. 20, 2009 Oral Arg. at 57:2-59:14.) Evidence of the contract extension to March 2005 is relevant only for these reasons and, as such, does not violate Rule 403. Accordingly, Plaintiff's Motion *in limine* (Doc. No. 64) will be granted in part and denied in part.

C.      Defendant's Motion *in Limine* to Exclude
        Evidence Of Settlement Negotiations.

As noted, Plaintiff filed this lawsuit against Defendant for failure to pay several invoices in 2004. Defendant raised a counterclaim against Plaintiff for failure to timely deliver two (2) shipments of styrene in November 2004. In this Motion *in limine*, Defendant asserts that after Plaintiff terminated the 2004 Contract in January 2005, the parties engaged in settlement negotiations to resolve their disputes. Defendant submits that Plaintiff should be precluded from offering evidence that during these settlement negotiations, Defendant "acknowledged its debt and represented its intention to pay all of the invoices in full." (Pl. Pre-Trial Memorandum, 4.) The evidence of settlement negotiations consists almost entirely of email correspondence from January 2005 to June 2005 between the parties and internal emails within Purolite. Defendant seeks to exclude the emails under Federal Rule of Evidence 408.[1] Plaintiff contends, however, that the content of these emails does not constitute "settlement negotiations" but rather business negotiations "regarding when and how the amount due would be paid by [Defendant]." (Id. at 6.)

_____

[1]These exhibits have been marked as P-11, P-12, P-13, P-14, P-16, P-17, P-66, P-69, P-70, P-72, P-73, P-74, P-77, and P-87.

Federal Rule of Evidence 408, entitled "Compromise and Offers to Compromise," provides as follows:

> (a) Prohibited Uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> (1) furnishing or offering or promising to furnish - or accepting or offering or promising to accept - a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

Rule 408 applies to "evidence concerning settlement or compromise of a claim, where the evidence is offered to establish liability, or the validity or amount of the claim." Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 526 (3d Cir. 1995). There must exist "at least an apparent difference of view between the parties concerning the validity or amount of a claim." Id. Rule 408 only applies to an "actual" dispute, which includes both threats of litigation and less formal stages of contention. Onal v. PB Amoco Corp., 134 Fed. App'x 515, 518 (3d Cir. 2005) (denying the Motion *in limine* because no actual dispute between the parties existed during the relevant period).

To trigger the Rule 408 prohibition, there must be an actual "dispute regarding the validity or amount of the claim and some form of compromise as to that dispute." Tsudis Chocolate Co. v. FGH Consulting USA, Inc., No. 07-1574, 2008 WL 4272651, *1 (W.D. Pa. Sept. 11, 2008) In Tsudis, the District Court held that the party seeking to preclude evidence of alleged settlement negotiations under Rule 408 failed to prove that the documents reflected a dispute as to the validity

or amount of the claim. The court found that the evidence merely reflected the moving party's admission of the amount due and owing, and an attempt to renegotiate the payment deal. Id.

Here, Plaintiff similarly argues that there was neither a dispute at the time of the parties' discussions nor some form of compromise. Instead, the email correspondence of early 2005 (the documents sought to be precluded by Defendant) merely shows Defendant's intention to pay all unpaid invoices in full and contains discussions of when the invoices will be paid, rather than a true claim for damages or a compromise regarding a dispute. As in Tsudis, Plaintiff asserts that Defendant does not dispute the amounts due, and the documents sought to be precluded merely reflect an attempt to renegotiate the deal between the parties.

Plaintiff supports its argument by citing the Rule 408 Advisory Committee note, which states, "The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum." Moreover, "an admission of liability made during negotiations concerning the time of payment and involving neither the validity nor amount of the claim is not within [Rule 408's] exclusionary protection." 2 Jack Weinstein & Margaret Berger, Weinstein's Evidence § 408.06, 408-25 (2009).

Here, contrary to Plaintiff's contentions, an actual dispute existed in late 2004 and early 2005 beyond mere business discussions over the payment timetable. Actual disputes between the parties included, *inter alia*, Defendant's failure to pay several invoices, Defendant's contention regarding improper invoicing by Plaintiff, Plaintiff's failure to provide Defendant with three (3) rail tank cars of styrene in November 2004, Plaintiff's rejection of Defendant's contract proposal in December 2005, and Plaintiff's alleged premature termination of the 2004 Contract. While threats of litigation

need not be present for Rule 408 to apply, the dispute at issue here even broached the subject of litigation, as seen in Brian Wareham's December 10, 2004 email.

> This is unacceptable, we know that these RTC's have been in Ploesti since December 2nd.  To put it politely, Schenker need [sic] to pull their finger out and make things happen.  We have maximum one weeks' [sic] styrene left.  If, in the circumstances, we run out of material a considerable compensation claim will be lodged with whoever is responsible for the delay in sorting out this situation.

As further evidence of a material dispute between the parties, Defendant produced a January 7, 2005 email from Matthew Rigby to Brian Wareham:

> You are aware that there are quite a few invoices outstanding now and though I did try to contact you before Christmas to discuss these you had already left.  Some of these invoices are very overdue and we consider the situation to be very serious.
>
> I confirm that I have put a block on any further styrene deliveries to your plant until we are up to date with payments.
>
> We really mustn't let the payment issue spoil this deal.  We are set up to supply your styrene requirements this year as per our agreement but you have to have to [sic] keep your side of the bargain and pay on time.

Additionally, Defendant offers testimony from Brian Wareham's deposition:

> Q. . . . I'm asking the witness, who says that this was his area of responsibility, as to whether he has a recollection that there were unpaid invoices.
>
> A. When you say "unpaid," you mean overdue?
>
> Q. Yes.
>
> A. Well, there were invoices which [Rigby] claimed were overdue, yes.
>
> Q. Did you disagree with him?
>
> A. On some of them, yes.

| Q. | But not all of them? |
|---|---|
| A. | I don't remember specifics, but not on all of them, no. |
| Q. | And did you ever tell [Rigby] that you disagreed that they were overdue? |
| A. | I believe so. . . . I believe I did point out to him, yes, that some of [the invoices] were not overdue. |

(Wareham Dep., 50:6-51:5.)

It is clear that a dispute existed in and after January 2005, as evidenced by the emails and deposition testimony, and the exchange of emails during this period reflect attempts to resolve the dispute. Moreover, when viewed in the totality, the emails do not suggest that Defendant was simply attempting to renegotiate its deal or payment terms with ECEM for a debt with an agreed upon amount. Consequently, the provisions of Rule 408 apply here, not the holding in Tsudis.

Rule 408 is to be construed to effectuate its purpose of encouraging freedom of discussion with regard to compromise. Further, as the Tenth Circuit noted, "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers." Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1364 (10th Cir. 1987). Accordingly, Defendant's Motion *in limine* (Doc. No. 59) will be granted. Exhibits P-11, P-12, P-13, P-14, P-16, P-17, P-66, P-69, P-70, P-72, P-73, P-74, P-77, and P-87 are inadmissible under Rule 408 because the email correspondence reflects concessions made by Defendant during settlement negotiations of an ongoing actual dispute between the parties.

D.  Defendant's Motion *in Limine* to Bar Evidence
    Of ECEM's "Terms and Conditions of Sale."

Defendant seeks to prevent Plaintiff from offering at trial a document entitled "General Terms and Conditions of Sale" ("GTCS") on the basis that it is extrinsic parol evidence not part of the 2004 Contract.  The document contains fourteen (14) Articles and bears at the top the following language:

> General Terms and conditions of Sale at ECEM EUROPEAN CHEMICAL MARKETING B.V. (a private company with limited liability, with its registered office in Amsterdam) As deposited with the District Court at Amsterdam under No. 105 on May 1st, 1981 As filed with the Chamber of Commerce and Industry in Amsterdam.

The GTCS, *inter alia*, provides Plaintiff with the right to recover statutory interest plus an additional 4% upon Defendant's failure to pay an invoice, and the GTCS provides recovery of all fees and costs incurred by Plaintiff in pursuing payment.[2]  Plaintiff claims that the invoices for payment sent to Defendant made reference to the GTCS.  Plaintiff also claims that the goods delivered contained the same reference.  (Pl. Resp. to Def. Mot. in Limine to Preclude Evidence of the Terms and Conditions of Sale, 2.)  Although an invoice does not appear in the record, the Court will accept the accuracy of this allegation for the purposes of this argument.

---

[2]As noted, the 2004 Contract contained the following provisions, *inter alia*: (1) all deliveries were to take place "for arrival in Victoria during the 3rd week of the month" and (2) all shipments were designated as "DDU Victoria."  Defendant argues that the GTCS contains terms that contradict these two provisions of the 2004 Contract.  The GTCS provides that Plaintiff will not be liable for a delayed delivery except for "intent or gross error," and that "goods shall in all cases be transported at buyer's risk," which contrasts with the general DDU principle that the seller retains the risk of loss until delivery is completed.

1. <u>Parol Evidence Issues.</u>

Defendant contends that the 2004 Contract represents the entire agreement between the parties, and the GTCS is inadmissible to vary, alter or modify the terms of the 2004 Contract. Defendant claims that Plaintiff never advised Defendant that the GTCS could modify the terms of the 2004 Contract, nor was the GTCS attached to the 2004 Contract. Instead, according to Defendant, Plaintiff's Complaint establishes that the 2004 Contract was a complete and final expression of the parties' intent:

> On or about December 16, 2003 Purolite placed on ECEM Purchase Order V07/103 for the delivery of approximately 100 metric tons per month, or 1200 metric tons per year, of styrene monomer at an agreed-upon price. On or about the same date, in writing and through its actions of sale and delivery, ECEM confirmed the order, thus creating a binding and enforceable contract.

(Plaintiff Complaint, ¶5.) Plaintiff maintains, however, that the GTCS is a portion of the contract between the two parties. Each shipment of styrene sent to Defendant, beginning in 2002, contained an invoice for payment which expressly incorporated the GTCS. Plaintiff submits that Defendant's practice was to approve each invoice in writing, and during the three-year relationship between the parties, Defendant consistently accepted the goods and invoices, each of which contained a reference to the GTCS.

The United Nations Convention on Contracts for the International Sale of Goods ("CISG") controls this case. The CISG governs all contracts for the sale of goods between parties whose principal places of business are in different nations if those nations are signatories to the treaty. <u>B.P. Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador</u>, 332 F.3d 333, 336 (5th Cir. 2003); CISG,

art. 1.[3]  Here, both the United States, where Defendant maintains its principal place of business, and the Netherlands, where Plaintiff maintains its principal place of business, are signatories to CISG.

The central dispute in this Motion *in limine* is whether CISG adopts the American parol evidence rule which prohibits the introduction of extrinsic evidence that varies, alters or modifies the terms and conditions of a subsequent or contemporaneous written document.  Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 994 (3d Cir. 1987) (describing the parol evidence rule); Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001) ("If parties have integrated their agreement into a single written memorial, all prior negotiations and agreements in regard to the same subject matter, whether oral or written, are excluded from consideration.").  CISG itself contains no express statement on the role of the parol evidence rule.[4]  Plaintiff suggests that the few courts that have addressed this issue have found that CISG requires all relevant evidence of the parties' intent to be admitted to interpret the terms of the agreement even if the evidence contradicts a written document.  Defendant argues, to the contrary, that the 2004 Contract is the only permissible evidence concerning the parties' intent and that parol evidence is barred.

Article 8 of CISG governs the interpretation of international contracts for the sale of goods, and the dispute over the application of this provision is critical to a decision on this Motion. Article 8 provides as follows:

---

[3]Article 1 of CISG states in relevant part:
(1) This Convention applies to contracts of sale of goods between parties whose places of business are in different States:
(a) when the States are Contracting States...

[4]Article 7(2) of CISG states as follows: "Questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law."

(1) For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.

(2) If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.

(3) In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

Plaintiff contends that Article 8 of CISG requires consideration of the communications and negotiations of the parties when determining their intent and the terms of the agreement. Plaintiff relies heavily on MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova D'Agostino, S.P.A., an Eleventh Circuit case involving a contract dispute governed by CISG, for the proposition that the parol evidence rule does not apply in actions involving CISG. 144 F.3d 1384 (11th Cir. 1998). In that case, the purchaser and seller reached an oral agreement on the terms of price, quality, quantity, delivery and payment. Subsequently, the parties memorialized these terms on one of seller's standard, pre-printed forms. After the buyer initiated a breach of contract claim stemming from the seller's failure to satisfy orders, seller argued that it had no obligation to fill purchaser's orders pursuant to the default payment provision listed on the back of the pre-printed form. The buyer asserted that the parties never intended for the terms and conditions printed on the reverse side of the order form to apply to their agreements. The buyer provided affidavits explaining that it had no subjective intent to be bound by the terms even though a provision directly below the signature line expressly incorporated those terms.

The court held in MCC that the district court erroneously disregarded the affidavits showing the parties' subjective intent not to be bound by certain terms and conditions of the contract. The court found that "CISG appears to permit a substantial inquiry into the parties' subjective intent, even if the parties did not engage in any objectively ascertainable means of registering this intent." Id. at 1387. This finding was based on the court's interpretation of Article 8(1) of CISG, which requires an inquiry into a party's subjective intent "where the other party knew or could not have been unaware what that intent was." Art. 8(1). Further, Article 8(3) explains that all relevant circumstances must be considered when determining the intent of the parties. Consequently, the interplay between Articles 8(1) and 8(3) suggests that parol evidence that would reveal the subjective intent of the parties must be admitted.

Here, Defendant argues that Article 8(1) is not the applicable CISG provision because Defendant was objectively unaware of Plaintiff's intent to incorporate the GTCS into the 2004 Contract. For this reason, Defendant claims that MCC is factually distinguishable from the present matter. Instead, Defendant asserts that this case is governed by the interplay of Articles 8(2) and 8(3) of CISG, which requires the Court to base its decision on objective, rather than subjective, evidence of the conduct of the parties.[5]

----

[5]Defendant relies predominantly on Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc. for the proposition that the parol evidence rule prohibits a buyer from introducing evidence of alleged oral agreements to alter the terms of the written agreement. 993 F.2d 1178, 1183-84 (5th Cir. 1993). In Beijing Metals, the court ruled in a footnote that the parol evidence rule applies regardless of whether Texas law or CISG governed the dispute. Id. at 1184 n.9. The court did not employ any analysis of CISG jurisprudence and the relation of the parol evidence rule. Accordingly, the Court does not consider Beijing Metals particularly persuasive on this point.

Regardless of whether Article 8(1) or 8(2) is applicable to this matter, the Court is persuaded that CISG allows all evidence of the parties' intent to be admitted to interpret the terms of the agreement. In other words, Article 8(3) requires due consideration to be given to all relevant circumstances regardless of whether Article 8(1) or 8(2) applies. See Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting GmbH, No. 05-702, 2009 U.S. Dist. LEXIS 25201, *12 (S.D. Ohio Mar. 26, 2009) (citing Article 8(2) for the proposition that "CISG contains no parol evidence rule, but allows the Court to consider statements or conduct of a contracting party to establish, modify, or alter the terms of a contract"); Calzaturificio Claudia s.n.c. v. Olivieri Footwear Ltd., No. 96-8058, 1998 U.S. Dist. LEXIS 4586, *18 (S.D.N.Y. Apr. 6, 1998) ("[C]ontracts governed by the CISG are freed from the limits of the parol evidence rule and there is a wider spectrum of admissible evidence to consider in construing the terms of the parties' agreement."); TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00-5189, 2006 U.S. Dist. LEXIS 59455, *22 (S.D.N.Y. Aug. 22, 2006) (finding that unlike American law, the CISG has no parol evidence rule).

"Consequently, the standard UCC inquiry regarding whether a writing is fully or partially integrated has little meaning under the CISG and courts are therefore less constrained by the 'four corners' of the instrument in construing the terms of the contract." Calzaturificio, 1998 U.S. Dist. LEXIS 4586, at *19. Accordingly, the Court will not preclude extratextual evidence of negotiations or agreements, such as the GTCS and email communications, made prior to the 2004 Contract pertaining to the scope of the parties' rights and obligations under it.[6] Another pertinent provision

_____

[6]Plaintiff also cites to Article 11 of CISG to support the argument that CISG rejects the parol evidence rule outright. Article 11 states as follows: "A contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be proved by any means, including witnesses." See Larry A. Dimatteo, An International

of CISG is Article 9, which states: "The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves." Art. 9(1). Consequently, Defendant's Motion *in limine* to preclude parol evidence of the GTCS will be denied.

## 2. Judicial Admission and Judicial Estoppel.

Next, Defendant argues that under the doctrines of judicial estoppel and judicial admission, Plaintiff is barred from introducing any evidence to prove that the 2004 Contract was not accepted in its entirety, or that the 2004 Contract is subject to the GTCS. "Judicial estoppel requires (1) a clear inconsistency and (2) that the party estopped obtain an unfair advantage from that inconsistency." Teleglobe Commc'ns Corp. v. BCE, Inc., 493 F.3d 345, 377 (3d Cir. 2007). Under judicial estoppel, a party is barred from adopting conflicting positions in a legal proceeding. Likewise, under the doctrine of judicial admission, statements of fact made by one party in pleadings and stipulations are binding on that party. Nasim v. Shamrock Welding Supply Co., 563 A.2d 1266, 1267 (Pa. Super. Ct. 1989).

Here, Defendant maintains that Plaintiff stated in the Complaint that the 2004 Contract was accepted by Plaintiff and that it constitutes a "binding and enforceable contract." (Pl. Compl. ¶5.)[7]

_____

Contract Law Formula: The Informality of International Business Transactions Plus the Internationalization Of Contract Law Equals Unexpected Contractual Liability, 23 Syracuse J. Int'l L & Com. 67, at 109 (1997) ("The CISG's lack of a writing requirement allows all relevant information into evidence even if it contradicts the written documentation.")

[7]¶5 of Plaintiff's Complaint states in its entirety:

On or about December 16, 2003 Purolite placed on ECEM Purchase Order V07/103 for the delivery of approximately 100 metric tons per month, or 1200 metric tons per year, of styrene monomer at an agreed-upon price. On or about the same date, in writing and through its actions of sale and delivery, ECEM confirmed that order, thus creating a binding and enforceable contract.

Consequently, Defendant argues that Plaintiff should be barred from introducing any evidence that the 2004 Contract did not represent the entire agreement because Plaintiff is bound by its pleading.

Plaintiff contends that the Complaint does not conflict with the proposition that extrinsic evidence, including negotiations, communications, and the GTCS as discussed above, must be used to interpret the terms of the contract. The Court agrees and is persuaded that Plaintiff is not offering conflicting arguments that should be precluded under judicial estoppel or judicial admission. In the Complaint, Plaintiff did not express that the 2004 Contract was the full and complete Contract. Rather, Plaintiff contends that the 2004 Contract, coupled with "its actions of sale and delivery," constitutes the Contract in full. Because there is no clear inconsistency in Plaintiff's argument, Defendant's Motion in *limine* (Doc. No. 60) to preclude evidence of the GTCS under judicial estoppel or judicial admission will be denied.

      E.      Defendant's Motion *in Limine* to Bar Evidence Of Prior
                   Negotiations Leading Up To the 2004 Contract, and to Bar
                   <u>Evidence That the 2004 Contract Was Not Accepted and Binding.</u>

Similar to the previous Motion *in limine*, Defendant seeks to preclude Plaintiff from introducing parol evidence consisting of negotiations prior to the execution of the 2004 Contract, including, *inter alia*, (1) there was no requirement of styrene delivery on the third week of the month; (2) there was no requirement to deliver three RTCs per month; and (3) Plaintiff is absolved of liability through the offer to provide road-truck delivery of styrene after two shipments were erroneously sent to a different purchaser in late 2004. Defendant also argues that Plaintiff may not introduce evidence that the 2004 Contract was not accepted or that it is not binding and enforceable. Defendant rests on the same arguments offered in the Motion *in limine* to preclude evidence of the GTCS. For the foregoing reasons, as described in Section II, D of this Opinion, the Court is not

persuaded that the evidence noted above by Defendant of prior negotiations leading up to the 2004 Contract should be barred, and Defendant's Motion *in limine* (Doc. No. 61) will be denied.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff ECEM's Motions *in limine* and grant in part and deny in part Defendant Purolite's Motions *in limine*.   A separate Order for each Motion follows.